644 So.2d 435 (1994)
Daniel Dewitt GAMBRELL
v.
Judy Diane GAMBRELL.
No. 93-CA-00541.
Supreme Court of Mississippi.
October 13, 1994.
*436 James E. Winfield, Winfield & Moran, Vicksburg, for appellant.
Eddie H. Tucker, Jackson, for appellee.
Before DAN M. LEE, P.J., and McRAE and SMITH, JJ.
SMITH, Justice, for the Court:
Dr. Daniel Gambrell, appellant herein, appeals to this Court from an order of contempt in the Hinds County Chancery Court. The chancellor found Gambrell was not entitled to attack portions of the divorce judgment as void, finding he had not challenged the decree within a reasonable time. Further, no modification of child support was granted. Finally, Gambrell was found in wilful civil contempt of court for failure to pay child support, alimony and the school expenses of his daughter and an incarceration order was issued. Although we cannot say the chancellor was manifestly in error in denying Gambrell's attempt to attack the decree or in denying the requested modifications, *437 we find the contempt order must be reversed.

STATEMENT OF THE FACTS
Judy Gambrell was granted a divorce from Daniel Gambrell in June of 1992 on her claim of cruel and inhuman treatment. Daniel was ordered to pay lump-sum alimony at $2,000 monthly, child support of $1,100 per month and various educational expenses of his minor daughter. Custody of the parties' only child, Danyelle, age sixteen years, was awarded to Judy with Daniel to receive visitation.
Citing Daniel's failure to make scheduled payments under their June 1992 divorce decree, Judy filed an amended motion for contempt in November 1992. At that time, the stated amount in arrears was $11,270. Within his answer, Daniel included a counterclaim for modification, requesting that his child support obligation be reduced and that he be relieved of the provision ordering him to pay the daughter's high school tuition and school-related expenses. A contempt hearing was held before Special Master Oran C. Page on February 9, 1993.
Daniel testified he was unemployed on the date of the hearing, but ordinarily practiced medicine. He stated he had stopped working at his private practice as of August 14, 1992, due to a fire which destroyed his office building. Daniel stated he had paid both the child support and alimony as set forth in the divorce decree until he was no longer able to do so.
Daniel stated since the fire he was living with his sister who had provided him money. He testified he was living in his office when it was destroyed and thus had lost "everything." Daniel admitted the police had found about $9,000 identified as belonging to him, which was apparently the result of insurance proceeds and which he had somehow lost at the bank. Daniel admitted other than a $6,000 payment to bring his payments up to date in September of 1992, that he had not made scheduled payments.
Judy Gambrell testified that following the divorce decree of June 1992, Daniel made his scheduled payments the following month, but failed to make payments in August or September. Judy first filed a contempt motion on August 18, 1992. She stated a hearing was set for September, and Dr. Gambrell on that date paid the amounts in arrears totalling $6,000. She stated as of the February 1993 hearing, Daniel owed $10,000 in alimony payments (5 months at $2,000 per month) and child support of $2,200 (2 months at $1,100 each), for a total of $12,200. Judy stated she was requesting the court to require Daniel to pay the arrearage or be incarcerated until he did so.
Upon cross-examination, Judy admitted Daniel's office burned in August 1992. She stated she was "also aware that his girlfriend set it on fire." She further stated Daniel could have practiced medicine a number of other places, but she could not say where he had been or what he had done since August 1992 because he had gone "underground" and no one had seen him since then. Judy testified she worked for the State Department of Rehabilitation Services. Her gross salary was $1,800 per month with take-home pay of about $800 per month after several deductions. She stated a garnishment for Medicaid/Medicare was also "coming out of [her] check." Judy testified the tuition for their daughter's school was due January 1st, in the amount of $1,955, which had to be paid or she would "get put out of school."
On re-direct, Judy stated Daniel was ordered to pay 3/4 of Danyelle's tuition, plus registration for the 1992-93 school year. She stated these amounts were in addition to the scheduled child support payments, also in arrears.
On further examination, Daniel testified he was at the time attempting to relocate and reopen his private practice in Forest, Mississippi. He was in the process of hiring employees and doing "extensive renovations" to a new building. Daniel stated he had no monies at the time of the fire, to the extent that the checks he wrote to pay his employees during that same week bounced. He testified that the money he had paid to Judy thus far was derived from insurance proceeds as a result of the fire. He stated $15,000 of the proceeds went directly to the IRS, and another $40,000 was paid by the *438 insurance company straight to the bank for the mortgage on his building. In addition, $15,000 went for renovations and $14,000 went to his ex-wife.
Daniel stated he simply did not have the money to pay the amounts owed to his ex-wife. He stated he was not intentionally refusing to comply with any court orders. He further stated if the $9,000 being held by the City of Jackson Police Department were returned to him, he would apply it to the amount owed to his ex-wife. Daniel testified he needed to be able to practice medicine again since it was his only means of livelihood. He stated he had no money to buy the basic office equipment to rebuild his practice.
Daniel testified the fire insurance proceeds totalled $98,000. He stated he hoped to sell the property upon which his old office was located but had received no offers. He described the property as two buildings put together, with the half housing his office being destroyed. Daniel stated it was not possible for him to reopen his office in the other half of the building because it was unheated and in a flood zone which stayed full of water.
Following the hearing, the special master found Daniel in contempt, based on his total arrearage in the amount of $19,310 and recommended that he be given thirty (30) days to satisfy the judgment or be incarcerated. A second hearing was held April 27, 1993, on Daniel's motion to reconsider the order of contempt with Chancellor Owens presiding.
Daniel testified that following the order finding him in contempt and in arrears, he went to a bank in Forest and requested a loan, but was told his credit history was bad. Eventually the bank did loan him some money. Daniel stated he had made payments of $2,000 and $6,500 since the order. He stated since the first hearing, he had begun practicing medicine again at his Forest office. Daniel stated he reopened his medical practice on March 15, 1993, and had during that month made another $900 payment to his ex-wife. He stated he was now seeing 6-7 patients per day and was "pleased" with this since he was not yet fully established. Daniel testified he owned a 1956 Jaguar which was in a deteriorated state. He stated he never intentionally avoided making the payments due his ex-wife.
Daniel further testified his former office building was still up for sale. He stated the property would be sold to pay county taxes owing for 1990 unless redemption was made by August of 1993. Taxes due for the years 1990-92 totaled $19,665.50. Daniel also testified that a money judgment resulting from a lawsuit filed against him and his ex-wife, in the amount of $30,000, had not yet been satisfied. As a result, his income from Medicare had been garnished since the judgment date.
On cross-examination, Daniel stated that with a portion of the insurance proceeds from the fire, he purchased a new truck for $16,000. The Bank of Forest used this vehicle as collateral in loaning him $10,000. He spent approximately $10,000 to renovate his new office in Forest. With the remaining proceeds, Daniel "caught up" on payments owed to his ex-wife, between $10,000  $12,000, and the IRS took the remaining $13,000.
Andrew E. Gay, CPA, testified he had done Daniel's 1992 personal income taxes. Gay stated Daniel's gross income from the operation of his practice showed a loss of $3,031 for the year. However, with the insurance proceeds figured in, Daniel's total income was $52,692 for 1992. Gay testified since Daniel had reopened his practice, his receipts from March 15 to April 15 showed cash receipts of $1,093 and Medicaid billings to be submitted in the amount of $1,980.
The court found Daniel in contempt and further found there were assets available to him to purge himself, such as the parts of the Jaguar car, the pickup truck and the real property where he formerly practiced medicine in Yazoo City. The court allowed the defendant the remainder of the week to comply with the contempt order or be incarcerated. The record indicates a summons was executed and Daniel was incarcerated on May 4, 1993. Daniel's appeal to this Court followed.

DISCUSSION

I. THE LOWER COURT ERRED IN REFUSING TO GRANT THE APPELLANT *439 RELIEF FROM THE JUDGMENT PURSUANT TO RULE 60 b.
Daniel contends Miss. Rules of Civil Procedure, Rule 60(b)(4) provides him with the proper method by which to attack that portion of the divorce decree ordering him to pay private high school tuition for his daughter. Asserting it was "clear error" for the lower court to so order, Daniel argues the decree and the contempt order of June 5, 1992, should be set aside and the case remanded for just consideration. Daniel similarly requested modification of the ordered child support and alimony payments.
The lower court at the May 4, 1993, hearing dismissed this argument, following this exchange:
THE COURT: Well, I will deny your motion, Rule 60(b)(4). Surprisingly, 60(b)(1), (2) and (3) required it to be filed within six months from the date the judgment was entered. Primarily for the same reason I will deny your motion; at this point the parties have relied on this agreement. This child has been in school and is almost finished. The proper mechanism for Dr. Gambrell to take would have been file a motion to modify prior to her entering school, so I will deny the motion.
MR. WINFIELD: I would like to call the Court's attention that the motion was filed within six months, however. It was filed in December of 1992, which is within six months of that period of time. Also, in the alternative, as I interpret the rule, it would be within two years if the decree is void. But I understand the Court's reasoning.
THE COURT: I'm not sure the decree is void. What you're saying is that if a provision of the decree which is termed as private school tuition is void, and my problem is that it should have been addressed at that time either the decree was entered or shortly thereafter. What probably would have happened would have been child support would have been increased to cover the cost of the education, so after she's almost finished with school to bring up that particular issue I think is unfair. I'm denying the motion.
Miss. Rules of Civ.Proc., Rule 60(b)(4) provides for relief from a judgment or order on the basis that the judgment is void. The rule further provides, as to time limitations, that motions thereunder "shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than six months after the judgment, order, or proceeding was entered or taken." The rule does not require a motion under subsection (b)(4) to be made within six months, but only "within a reasonable time."
The chancellor determined Daniel should have made his motion at the time the decree was entered or shortly thereafter. The record indicates the divorce decree was entered June 5, 1992. The docket sheet shows Judy first filed a contempt motion in August 1992, two months later. This is supported by Daniel's own testimony in which he stated he made a payment in September 1992 on the date of the scheduled contempt motion hearing to bring his payments up to date. Following Judy's next Motion for Contempt filed in November 1992, Daniel, in his Answer and Counterclaim first raised this 60(b)(4) motion regarding private tuition. The record shows this Answer and Counterclaim was filed in chancery court on January 4, 1993.
We are of the opinion that the chancellor correctly determined that it was not reasonable for Daniel to wait nearly 7 months after the divorce decree went into effect, and after his daughter had nearly completed the school year, to first challenge that part of the decree ordering payment of the daughter's tuition. It must be considered that Daniel may have never challenged the decree on this basis were it not for the fact that he was forced to return to court in response to his ex-wife's contempt motions. In fact, at the time of Judy's contempt motion, Daniel was some $12,000 in arrears, which had increased to $18,000 by February 1993.
Daniel cites the case of Pass v. Pass, 238 Miss. 449, 118 So.2d 769 (1960), as his only support for the the contention that a father cannot be required to pay private high school tuition for his child in addition to child support. In that case, the father challenged the lower court's modification of the divorce decree to allow for increased child support necessary *440 to finance the child's college education. This Court stated the "serious question ... is whether the court has the legal right to compel the father to provide funds for a college education for his minor child." Id. at 455, 118 So.2d 769. The Court found first that the views of the other jurisdictions were divergent. The Court then went on to note that in Bunkley and Morse's Amis on Divorce and Separation in Mississippi, Section 9.04, it was stated:
The expense of sending a child to school is part of the normal and usual support for which the father is liable, and which may be included in the allowance, or recovered by the mother in case no allowance is made. This expense does not include tuition or board at private or parochial schools, nor the expense of a college education. A father may give such special advantages to his child, but the law does not require it. The state requires that the child shall attend school, but at the same time, it has provided adequate schools for that purpose. And if the father provides the necessary expense of attendance at the public schools, his legal duty has been discharged.
It is the language above on which Daniel relies in support of his contention that it was "clear error" to require him to pay both private school tuition and child support for his daughter. However, Daniel fails to acknowledge the holding the Court ultimately reached in Pass, where it was concluded:
We have, however, found no Mississippi case, and counsel have cited none, supporting this statement. In 67 C.J.S., Parent and Child, page 692, appears the following: "The extent of education beyond what is required by the school system of this state is left largely to the discretion of the child's father. Ordinarily, he is under no duty, and may not be compelled, to give his child a college or professional education, regardless of his financial capacity. However, it has been held that the father may be required to provide funds for a college education of his minor child in the custody of the mother where the adaptability of such child for further education has been plainly shown.

Thus it will be observed that there are conflicting views on the question here presented, and in the absence of a precedent among our own decisions, we hold that where the minor child is worthy of and qualified for a college education and shows an aptitude therefor it is the primary duty of the father, if in reason financially able to do so, to provide for the funds for the college education of his minor child in the custody of the mother, where the mother and father are divorced and living apart."
Id. at 457-58, 118 So.2d 769 (emphasis in original).
The increase in child support to go toward college expenses was affirmed. As the chancellor herein noted, the Pass case was concerned with college expenses, but the reasoning and holding are equally applicable to the facts at hand regarding private high school education. Daniel does not deny Judy's contention that the daughter had attended private school since kindergarten at her father's insistence.
Pass does not support the proposition that the provision that Daniel pay for his daughter's school tuition was void. Even if this provision runs afoul of Pass, it would only mean that it was erroneous, not void. Perhaps most significantly, the chancellor clearly kept the best interest of the child in mind when she determined it would be "unfair" to the Gambrells' daughter to have her tuition payments ended during her final year, and indeed, final months of high school. This assignment is without merit.

II. THE LOWER COURT ERRED IN REFUSING TO MODIFY THE CHILD SUPPORT PAYMENTS.

III. THE LOWER COURT ERRED IN FINDING THAT THE APPELLANT WAS IN WILFUL CIVIL CONTEMPT.
Daniel next contends the lower court erred in refusing to modify the divorce decree to reduce the amount of child support he was required to pay following the fire at his former office building. He also argues it was error for the chancellor to find him in wilful contempt. In support, Daniel cites cases stating the well-known rule that a modification cannot be had absent a material or *441 substantial change in the circumstances of the parties. Spradling v. Spradling, 362 So.2d 620 (Miss. 1978); Savell v. Savell, 290 So.2d 621 (Miss. 1974). Further, the change in circumstances must be one not anticipated by the parties at the time of the decree. Clark v. Myrick, 523 So.2d 79 (Miss. 1988); Shaeffer v. Shaeffer, 370 So.2d 240 (Miss. 1979).
Judy responds first, that Daniel does not come before the Court with clean hands, since he waited until he was substantially in arrears prior to seeking any modification. Also, the chancellor determined it would not be in the child's best interest to have either her child support or tuition amounts modified just prior to her graduation from high school. Judy argues this decision was clearly within the chancellor's discretion and should not be disturbed absent clear abuse.
"The object of any child custody and support decree is the accomplishment of that which is in the best interest of the child." Leonard v. Leonard, 486 So.2d 1240, 1242 (Miss. 1986); Spain v. Holland, 483 So.2d 318 (Miss. 1986); Albright v. Albright, 437 So.2d 1003, 1005 (Miss. 1983). In addition, "in child support modification proceedings, as elsewhere, the chancellor is accorded substantial discretion and is charged to consider all relevant facts and equities, to the end that a decree serving the best interests of the children may be fashioned." Tedford v. Dempsey, 437 So.2d 410, 417 (Miss. 1983).
This Court has set out the proper course a parent should take when he is unable to meet his support obligations:
Where a party is unable to comply with a divorce decree, he should with reasonable promptitude, make the fact known to the court by proper petition and have the decree modified or suspended, and not wait until he has been cited for contempt. If a party fails to take this course of action, he will in response to the citation for contempt be required to make out a clear case of inability.
Thurman v. Thurman, 559 So.2d 1014, 1016 (Miss. 1990); Brown v. Gillespie, 465 So.2d 1046, 1048 (Miss. 1985), citing Duncan v. Duncan, 417 So.2d 908, 909-910 (Miss. 1982).
Daniel Gambrell waited until he was $20,000 in arrears and until he was hauled before the court a second time on contempt charges to seek a modification of the decree. The special master specifically referred to this fact, finding "that of record the defendant did not file any pleadings of record seeking suspension or relief from prior ordered payments of child support, alimony, and said prior attorney fee award until after he was served with process to the [contempt] motion at bar... ." The chancellor agreed and found Daniel had not made out a clear case of inability to comply with the decree. This Court has stated that such determinations "shall be done by a chancellor who hears all the facts, views the witnesses, and is informed at trial of the circumstances of the parties and particularly the circumstances of the children." Thurman 559 So.2d at 1017.
The contempt/modification hearing before the special master was not held until February of 1993 and the subsequent motion to reconsider was held two months later. Daniel argues the fire in August 1992 constituted a change in circumstances sufficient to warrant a modification in his child support payments. Without specifically referring to the fire, the chancellor denied Daniel's modification motion and motion to reconsider.
Although at first glance, it would seem that an event such as the fire at Daniel's former office might constitute a material change in circumstances, it does not follow that the chancellor erred in refusing to modify the child support in this case. The fire took place in August of 1992. By the time Daniel sought a modification of the decree, albeit only in response to repeated contempt citations, he was again practicing medicine and had not attempted to utilize any of the other monies or assets at his disposal to satisfy his obligations. Basically, it appears the reason for the modification request was temporary in nature and no longer in existence at the time Daniel finally submitted it to the chancellor.
The chancellor reviewed the detailed findings and recommendation of the special master. She then heard further testimony from Daniel in support of his motion to reconsider the contempt order. It was noted that as to *442 child support alone, Daniel had again failed to make payments for two months, totalling $2,200. The remaining arrearage included the daughter's tuition and school-related expenses, missed alimony payments, and attorney fees. The chancellor ruled, in part:
After hearing the testimony the Court does find that Dr. Gambrell is in contempt of court. It is obvious there are some assets available to Dr. Gambrell to purge himself of contempt. Some of those and most of them constitute personal property in the nature of automobiles, whether it be the truck, which is encumbered, or parts of the Jaguar.
In addition there is a substantial amount of real property owned in Yazoo City which is obviously offered for sale and currently on the market and currently available either through various bids of $20,000, $28,000 and $40,000. After payments of taxes with regard to the $40,000 bid there would be assets in the amount of approximately $20,000.
Therefore, Dr. Gambrell is to be held in contempt. He is to go ahead, I will give you until Friday to sell the Jaguar parts, to either sell this real estate or to make some other arrangements with Mrs. Gambrell to transfer some interest that you have, and for any other resources that you have for payment of the judgment.
In addition, it's been admitted that Dr. Gambrell is in arrears for March and April, less $900 that he's made as payment, and that should be added to the judgment as well.
In this case, after hearing full testimony from both sides, the chancellor expressly determined Daniel did indeed have personal assets from which to satisfy the amounts in arrears. "It is not the province of this Court to substitute its opinion for that of the fact-finder." Hammett v. Woods, 602 So.2d 825, 830 (Miss. 1992). We cannot find this decision was manifestly in error.
This Court has stated that "a husband may not petition for modification of the original decree without showing either that he has performed it or that his performance has been wholly impossible." Hooker v. Hooker, 205 So.2d 276, 278 (Miss. 1967). The chancellor did not abuse her discretion in finding modification was not warranted at the time of the hearing.
It is the chancellor's finding of wilful contempt, given the facts of this particular case that is the most troublesome problem confronting this Court. There is little doubt that Daniel lost "everything" in the fire that destroyed his Yazoo clinic. At the time of the fire, he was already experiencing difficult financial circumstances as his payroll checks to his employees were bouncing. The amounts of support paid to Judy subsequent to the fire and prior to the hearing were totally derived from the fire loss insurance proceeds. The proof is uncontradicted that Daniel was unemployed from August 1992 until March 1993 when he finally reopened his practice of medicine in Forest. He had no money to buy even the most basic office equipment and had borrowed money to remodel the office facilities. The record revealed no income to Daniel during that six month period of time. More importantly, Daniel told the chancellor that he simply did not have the money to pay the amounts owed to his ex-wife. The record confirmed his difficulty meeting financial obligations during the period of time in question. Daniel stated that he would prefer to make these payments rather than go to court, and would do so if he were able. He stated that he had paid the alimony and child support until he was no longer able to come up with the money. Daniel told the court that he had not intentionally avoided making the payments due his ex-wife. He also stated he was not intentionally refusing to comply with any court orders.
Technically, Daniel was in contempt of court. However, the question of whether or not he was in wilful and intentional contempt is another matter altogether. This is a very close question under the facts of this particular case. There is some degree of concern about what actual assets were available to Daniel with which to pay the support ordered by the chancellor. The pickup truck, Daniel's only source of transportation, was pledged as collateral to the Bank of Forest for a bank loan of $10,000 to renovate his new office. To say that parts from a 1956 *443 Jaguar automobile would be in such great demand as to constitute an asset is a bit much to expect. The Yazoo clinic property, even given the high bid of $40,000, is still subject to a tax lien of $19,665.50 and possibly the money judgment of $30,000, which had previously been the subject of a garnishment of Dr. Gambrell's medicare payments. This is of course assuming that any assets from the sale of the clinic property would be applied to the prior money judgment or the tax lien. To say any of the three aforementioned supposed assets could be absolutely considered as genuine assets is somewhat questionable.
The only asset about which there is little doubt or confusion except for the question of how it came to be left by Daniel in a Jackson bank is the $9,000 cash. At the time of the hearing the cash was still in the custody of Jackson Police Department, awaiting a claim by Daniel. During his testimony, Daniel offered to give this entire amount to Judy to be applied towards his child support arrearage. There can be no doubt whatsoever that the cash constituted a genuine asset. A more reasonable time should have been allowed by the chancellor to enable Daniel to claim the money. The chancellor could have ordered Daniel to claim the cash and it could have been promptly applied to his child support arrearage. The $9,000 cash would have amounted to approximately one-half of Daniel's delinquent support arrearage owed to Judy. We are reminded from the record that by the time the hearing was conducted in March of 1993, Daniel was once again practicing medicine with reported earnings of approximately $3,000 during his first month of being open for business. Presumably his ability to earn an income from the practice of medicine would continue to improve. The chancellor could have determined a new formula to cover the balance of delinquent child support arrearage and increased Daniel's future child support payments until the back due support had been paid in full. In the alternative the chancellor should have ordered Daniel to apply the $9,000.00 cash to his arrearage, and stayed the execution of her order for contempt for a specific and reasonable time to allow Daniel to comply therewith. Failure on Daniel's part to then comply would certainly warrant incarceration until he purged himself of contempt. On remand, this one matter can certainly be revisited by the chancellor.
Under these facts, we find that Daniel should have been afforded the benefit of the doubt as to being held in wilful contempt. A technical finding of contempt may have been proper but, a finding of wilful or intentional contempt by Daniel under the facts of this case is certainly suspect. At best such a finding by the chancellor was weak and thus reversible.
Due to the above stated reasons, we are of the opinion that the fire to Daniel's place of business must be considered such a change in circumstances to the extent that he should have been afforded an additional, limited period of time in which to comply with his payment obligations. However, the fire was not such a material change in circumstances requiring a modification of past or future child support payments. Additionally, the clean hands doctrine applies against Daniel on the issue of past due child support payments.
As she had done at a previous hearing when Daniel made partial satisfaction of his arrearage, the chancellor should have given Daniel time to recover from this unexpected, but temporary, setback in his ability to practice medicine and earn an income. At the very least a stay of execution of contempt should have been issued. During such a period, Daniel would have had time to utilize other resources and assets, as well as apply a portion of his income derived from his recently recommenced practice of medicine to pay child support and school expenses on behalf of his daughter. Giving Daniel until the end of the week to pay the arrearage, under these particular facts, was simply not realistic and thus of no benefit to either party. A more reasonable amount of time should have been allowed by the chancellor. Under the facts of this case, the chancellor erred in finding Dr. Gambrell in wilful contempt of court and in jailing him after allowing only one week to purge himself of such contempt.
*444 As to the missed child support payments, support obligations to the child "`vest in the child as they accrue, and no court may thereafter modify or forgive them if they be not paid.'" Dept. of Human Serv. v. Rains, 626 So.2d 136, 138 (Miss. 1993), quoting Varner v. Varner, 588 So.2d 428, 432 (Miss. 1991), citing Premeaux v. Smith, 569 So.2d 681, 685 (Miss. 1990). In fact, "the only defense to an action therefor is payment." Varner, 588 So.2d at 433. Thus, it was not possible to consider any modification of the child support payments already missed.

CONCLUSION
The chancellor was within her discretion in determining the issues presented by Daniel Gambrell. As to the attempt to have a provision of the decree declared void, it was unreasonable for Daniel to wait until his daughter's tuition was already owing the school before he attempted to gain relief via Rule 60(b)(4). The chancellor was not in error in finding this action was not well-taken as being neither timely nor supported in the law.
The request for modification for child support came after Daniel was in arrears for missing two months of payments for the second time. The chancellor had no power to take any action with regard to the payments in arrears. "The law remains firm that court-ordered child support payments vest in the child as they accrue and may not thereafter be modified or forgiven, only paid." Varner, 588 So.2d at 434. Thus, the amounts of child support owing at the time of the hearings must be paid.
The chancellor simply denied further relief as to the child support payments. The chancellor's order made no specific mention as to whether she found the fire to have been a material change of circumstances, as Daniel contends, but she clearly determined no relief was in order.
The record indicates when the motion to reconsider was heard, Daniel had reopened his medical practice in Forest, Mississippi and was again earning an income. Presumably, his situation would continue to improve based on this ability to again earn an income and satisfy his obligations under the decree. Thus, it appears if there ever was an inability to make payments, it was temporary in nature and had been resolved by the time of the hearing before the chancellor.
Finally, the determination that Daniel was in wilful contempt for failure to make the scheduled payments cannot stand. Although Daniel made no reasonable effort to settle this matter aside from a counterclaim for modification contained in his answer to Judy's second contempt motion, we find a reasonable, limited time to make payment was necessary. This case is affirmed with the exception of the order finding Daniel in wilful civil contempt of court. Under the particular facts of this case, such a finding was error.
AFFIRMED IN PART, REVERSED AND RENDERED IN PART. REMANDED FOR THE CHANCELLOR'S DETERMINATION OF APPELLANTS ABILITY TO APPLY AVAILABLE ASSETS TO THE SUPPORT ARREARAGE AND FOR SUCH OTHER ORDERS NECESSARY AND CONSISTENT WITH THIS OPINION.
HAWKINS, C.J., DAN M. LEE, and PRATHER, P.JJ., and SULLIVAN, PITTMAN, BANKS and ROBERTS, JJ., concur.
McRAE, J., concurs in result only.